# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

**Civil Action No. 24-132**

JOHN DOE NO.1, and
JOHN DOE NO. 2

      Plaintiffs,

v.

LAURA MYERS,
ANTHONY VRUGGINK, and
LEGACY ACADEMY, a Colorado nonprofit corporation

      Defendants.

---

## COMPLAINT

---

COMES NOW**,** Plaintiffs, John Doe No. 1, and John Doe No. 2, (collectively, "**Plaintiffs**"), by and through their undersigned counsel, state, allege, and aver as follows:

## <u>PARTIES</u>

1. Defendant Laura Myers ("**Defendant Myers**") is an individual that, upon information and belief, resides at 2542 W. Dry Creek Ct., Littleton, CO 80120. At all relevant times, Defendant Myers was the Dean of Students at Defendant Legacy Academy ("**Legacy**").

2. Matt Fonte ("**Fonte**") is an individual that, upon information and belief, resides at 41225 S. Pinefield Cir., Parker, CO 80138. At all relevant times, Fonte was a member of Legacy's board of directors and was Legacy's Treasurer.

3. Jen Zander ("**Zander**") is an individual that, upon information and belief, resides at 36553 View Ridge Dr., Elizabeth, CO 80107. At all relevant times, Zander was Legacy's Operations Manager.

4.      Matthew Ledesma ("**Ledesma**") is an individual that, upon information and belief, resides at 2381 Savage Rd., Elizabeth, CO 80107. At all relevant times, Ledesma was a member of Legacy's board of directors and was Legacy's President.

5.      Chris Wendel ("**Wendel**") is an individual that, upon information and belief, resides at 643 Shasta Ct., Kiowa, CO 80117.  At all relevant times, Wendel was a member of Legacy's board of directors and was Legacy's Vice President.

6.      Thomas Holm ("**Holm**") is an individual that, upon information and belief, resides at 40545 Madrid Dr., Elizabeth, CO 80107.  At all relevant times, Holm was a member of Legacy's board of directors and was Legacy's Community Relations Director.

7.      Defendant Anthony Vruggink ("**Defendant Vruggink**") is an individual that, upon information and belief, resides at 19765 Strasburg Ct., Parker, CO 80134. At all relevant times, Defendant Vruggink was a member of Legacy's Vice Principal and/or Interim Principal.

8.      Legacy is a Colorado nonprofit corporation with its principal offices at 1975 Legacy Circle, Elizabeth, CO 80107.

9.      Legacy operates under the auspices of the Elizabeth School District (the "**District**").

## JURISDICTION AND VENUE

10.     The Court is vested with jurisdiction over Defendants because Defendants are residents of the state of Colorado and/or are doing business in the state of Colorado.

11.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

12.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

13.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to Plaintiffs' claims occurred in this district.

2

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### *LEGACY'S AGREEMENT WITH PARENTS AND STUDENTS*

14.   Per Legacy's' 2022/23 Parent & Student Handbook (the "**Handbook**"), Legacy is a charter school developed under the Charter School Act of 1993 (C.R.S. § 22-30.5-101, *et seq*), meaning that Legacy is part of the District "but control of the day-to-day operations is given to the charter school staff, under the philosophy set forth by the Legacy Academy board of directors." A copy of Legacy's 2022/23 Parent & Student Handbook is attached hereto as Exhibit A.

15.   Parents of Legacy students are required to sign the Handbook to certify that the "handbook provides guidelines and summary information about the school's policies and procedures" and that they have "read and understand the information in the Handbook." Exhibit A at 43.

16.   A copy of the Handbook was given to John Doe No. 1, John Doe No. 2, and their respective families at the time of their enrollment at Legacy.

17.   Upon information and belief, John Doe No. 2's and John Doe No. 1's respective parents returned an executed copy of the Parent Statement of Acknowledgement to Legacy as a condition of John Doe No. 2's and John Doe No. 1's enrollment at Legacy.

18.   The basic relationship between a student and an educational institution is contractual in nature.

19.   Materials actually provided to a student, including enrollment agreements and catalogs, become part of the agreement.

20.   Therefore, the Handbook sets forth the contractual agreement between Legacy, its students, the parents of the students, and Legacy staff regarding the students' education.

21.   Legacy's "Mission" is "to guide students in developing their individual character and academic potential by providing opportunities for collaborative learning and hands-on experiences through the continuous surveying of modern technology, science, arts and extracurricular activities." *See* Exhibit A at 5.

22.   Legacy purports to promote a "safe environment that facilitates focused learning and restorative practices" by, *inter alia*, fostering positive "student/parent/teacher relationships", and hiring and maintaining a "unified group

3

of caring professionals focused on positive relationships and student achievement. Exhibit A at 6.

23.   Legacy espouses many "Curriculum Goals" for its students, including "Emotional & Social" goals such as: "recognizing a sense of self-worth." Exhibit A at 6.

24.   The Legacy "Board of Directors has the power to correct and resolve all concerns including school policy and procedural issues within the constraints of the district/charter school agreement, District policies and the laws of the State of Colorado." Exhibit A at 8.

25.   Every Legacy student has "the right to learn in an environment that is safe, conducive to the learning process, and free from unnecessary disruption." Exhibit A at 32.

26.   Legacy students are required to refrain from "inappropriate behavior," meaning behavior which is "intentional" and can range from "hitting, shoving, name-calling, and threats" as well as "teasing . . . when it becomes hurtful, unkind, or constant." Exhibit A at 33.

27.   Legacy's disciplinary procedure for inappropriate student behavior is multi-tiered (the "**Legacy Discipline Procedure**"). First, teachers are responsible for "ensuring their classrooms provide a safe environment that is conducive to learning." Exhibit A at 34. To foster this safe environment at the Grade 6 – 8 level, a teacher's role in the discipline procedure is as follows:

- "Classroom teachers will use restorative practices to allow a student to think about the impact of their behavior, reflect on their actions, and correct their behavior. Further action can be taken depending upon the class charter. Such actions may include circling up to discuss classroom behaviors and policies. Teachers will document inappropriate behaviors.

- If behavior is not corrected or persists, this includes not following the classroom charters, the classroom teacher will contact that student's parents and collaboratively attempt to work out a solution. This solution may involve the use of consequences or the recommendation to create a behavior plan. A detention may be assigned by a classroom teacher.

- If a student's behavior continually disrupts the classroom environment or is serious in nature, a referral will be made to school

4

administration and will proceed with second level disciplinary action."
<u>Exhibit A</u> at 34.

28.     Second, "[a] student will be referred to administration when inappropriate behavior remains persistent and/or becomes serious in nature and where the district policy and Colorado School Law guide the uses of suspensions or expulsions. The principal has the authority to suspend a student (or recommend expulsion) from school for one to five days for any of the following offenses while in school buildings, on school grounds, in school vehicles or during a school-sponsored activity and in certain cases when the behavior occurs off school property." <u>Exhibit A</u> at 34. Among other things, "violation of the District's policy on sexual harassment" can result in a student's referral to the Legacy administration for discipline procedures. <u>Exhibit A</u> at 35.

29.     Specifically, it is a violation of policy for students to "harass other students through conduct or communication of a sexual nature." *Id.* Further, "[a]ll matters involving sexual harassment complaints shall remain confidential to the extent possible." *Id.*

*LEGACY'S AGREEMENT WITH STUDENTS AND PARENTS TO ABIDE BY DISCTRICT POLICY CONCERNING ALLEGATIONS OF SEXUAL HARRASMENT*

30.     The Handbook defines sexual harassment as conduct including but not limited to "sex oriented verbal kidding, repeated remarks to a person with sexual or demeaning implication; unwelcome sexual advances, touching, patting, pinching, or brushing against another; requests for sexual favors, pressure for sexual activity (accompanied by implied or explicit threats concerning one's grades); any verbal or physical conduct of a sexual nature which has the effect of unreasonably interfering with an individual's educational performance or creating an intimidating, hostile or offensive educational environment." *Id.* at 37.

31.     Under the District's policy, all reports of sexual harassment from "students, district employees, and third parties, will be forwarded immediately to the district's Title IX Coordinator. Upon receipt, the Title IX Coordinator will contact the alleged victim of sexual harassment within three (3) business days to discuss the availability of supportive measures and explain the process for filing a formal complaint." A copy of the District's Title IX Sexual Harassment Grievance Process policy (the "**District Title IX Policy**") is attached hereto as <u>Exhibit B</u>.

32.     Under the District Title IX Policy, after a report of alleged sexual harassment is received by the Title IX Coordinator, "supportive measures" (defined as "non-

disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, without fee or charge, to the complainant or respondent, before or after the filing of a formal complaint or where no formal complaint has been filed") "will be offered to the complainant or respondent before or after the filing of a formal complaint, or where no formal complaint has been filed." Exhibit B at 2.

33.     Formal complaints of sexual harassment "must be filed within 180 days of the event giving rise to the complaint or from the date the complainant could reasonably become aware of such occurrence." Exhibit B at 4.

34.     After the filing of a formal complaint, the Title IX  Coordinator will conduct a formal and "impartial" investigation. *Id.*

35.     "The District will dismiss a formal complaint for Title IX purposes if the allegations do not meet the definition of sexual harassment; did not occur in the district's education or activity; or did not occur against a person in the United States." *Id.*

36.     Additionally, the District maintains a policy for non-Title IX sexual harassment—the "Nondiscrimination/Equal Opportunity (Complaint and Compliance Process)" (the "**Nondiscrimination Complaint Process**"). A copy of the Nondiscrimination Complaint Process is attached hereto as Exhibit C.

37.     The Nondiscrimination Complaint Process is substantially similar to the District Title IX Policy, enacted to "promptly and fairly address concerns and complaints about unlawful discrimination and/or harassment" not covered by the District Title IX Policy. *See generally* Exhibit C.

38.     Together, the District Title IX Policy and the Nondiscrimination Complaint Process serve as the agreement between Legacy, its staff and board members, Legacy students and parents, the District and its staff, regarding sexual harassment complaints and sexual harassment complaint procedures.

39.     Legacy, its staff, administrators, and board members—as set forth in the Handbook—are explicitly required to abide by the District Title IX Policy and the Nondiscrimination policy. Exhibit A at 35.

*JOHN DOE NO. 1 AND JOHN DOE NO. 2 ARE FALSELY ACCUSED OF
SEXUAL HARRASMENT*

40.     At all relevant times, Plaintiffs were in the 8th grade at Legacy.

41.     In February of 2023, Defendant Myers and Fonte accused Plaintiffs of sexually harassing a female student, including without limitation, by commenting about the female student exposing her buttocks to John Doe No. 2 in class and creating and/or maintaining a "screw list" (*i.e.*, a list of attractive female classmates) (collectively, the "**False Allegations**").

42.     A mere allegation of sexual misconduct can be devastating to the accused. A determination that a person engaged in sexual misconduct can potentially destroy the accused's educational, employment, and other future prospects.

43.     Tambralla Thorn ("**Principal Thorn**"), in her official capacity as Principal of Legacy, investigated the False Allegations and determined the False Allegations were false.

44.     Legacy maintains a dress code for its students. Exhibit A at 28 – 31.

45.     In or around February 2023, Plaintiffs' female classmate ("**Jane Doe**") likely violated Legacy's dress code policy by wearing a dress that was not knee length as required by Legacy dress code.

46.     Upon information and belief, Jane Doe is the daughter and/or step-daughter of one of the Legacy School Board members.

47.     Upon information and belief, Jane Doe informed several classmates that she had a crush on John Doe No. 2 and/or was attracted to John Doe No. 2.

48.     Upon information and belief, Jane Doe knowingly and intentionally bent over in front of John Doe No. 2, exposing her buttocks to John Doe No. 2 (the "**Indecent Exposure**").

49.     The Indecent Exposure made John Doe No. 2 uncomfortable, and John Doe No. 2 stated "don't look, look at Max's head" to John Doe No. 1.

50.     Principal Thorn investigated the Indecent Exposure incident and determined that John Doe No. 2's resultant comments did not warrant punishment or constitute sexual harassment.

51.     Upon information and belief, John Doe No. 1 initially chuckled at John Doe No. 2's statement and looked away from Jane Doe. Principal Thorn determined such chuckle did not constitute sexual harassment and did not warrant punishment under the Legacy Discipline Procedure.

52.     Principal Thorn determined Jane Doe did not hear John Doe No. 2's statement.

53.     Principal Thorn determined that neither John Doe No. 2's comment, nor John Doe No. 1's chuckle constituted sexual harassment under the Handbook or District policy.

54.     Principal Thorn informed Defendant Myers that neither John Doe No. 2's statement nor John Doe No. 1's chuckle warranted punishment or referral to Legacy administration under the Legacy Discipline Procedure.

55.     Upon information and belief, Defendant Myers reported the False Allegations and Principal Thorn's related investigative findings to the other Defendants.

56.     After the Indecent Exposure, Defendant Myers forced John Doe No. 2 to sit in her office with the door and window blinds closed for approximately one (1) hour without water and/or a bathroom break (the "**First Myers Office Imprisonment**").

57.     During the First Myers Office Imprisonment, John Doe No. 2 complained to Defendant Myers about heart burn, and John Doe No. 2 requested to leave the office to obtain a TUMS from Legacy's nurse.  Defendant Myers declined John Doe No. 2's request to obtain a TUMS from Legacy's nurse and informed John Doe No. 2 that a TUMS wouldn't help his heartburn.

58.     TUMS is specifically designed as a palliative measure for heartburn.

59.     During the First Myers Office Imprisonment, Defendant Myers occupied a position of authority over John Doe No. 2.

60.     During the First Myers Office Imprisonment, John Doe No. 2 felt threatened and intimidated by Defendant Myers, and John Doe No. 2's freedom of movement was restricted by Defendant Myers during the First Myers Office Imprisonment.

61.     During the First Myers Office Imprisonment, Defendant Myers told John Doe No. 2 that he could trust Defendant Myers if he discussed the Indecent Exposure with Defendant Myers.

62.     Based upon Defendant Myers's promises of trust and confidence, John Doe No. 2 reported the Indecent Exposure to Defendant Myers.

63.     After the Indecent Exposure, Defendant Myers forced John Doe No. 1 to sit in her office with the door and window blinds closed for approximately two (2) hours without food, water and/or a bathroom break (the "**Second Myers Office Imprisonment**").

64.     During the Second Myers Office Imprisonment, Defendant Myers occupied a position of authority over John Doe No. 1 and threatened John Doe No. 1 that he would face severe punishment if he attempted to leave her office without her consent.

65.     During the Second Myers Office Imprisonment, John Doe No. 1 asked Defendant Myers if he could telephone his parents and/or take a bathroom break.

66.     During the Second Myers Office Imprisonment, Defendant Myers instructed John Doe No. 1 that he was unable to telephone his parents and/or take a bathroom break.

67.     During the Second Myers Office Imprisonment, John Doe No. 1 felt threatened and intimidated by Defendant Myers, and John Doe No. 1's freedom of movement was restricted by Defendant Myers during the Second Myers Office Imprisonment.

68.     During the Second Myers Office Imprisonment, Defendant Myers told John Doe No. 1 that he could trust Defendant Myers if he discussed the Indecent Exposure with Defendant Myers.

69.     Based upon Defendant Myers's promises of trust and confidence, John Doe No. 1 reported the Indecent Exposure to Defendant Myers.

70.     After the Second Myers Office Imprisonment and after John Doe No. 1 reported the Indecent Exposure to Defendant Myers, Defendant Myers forced John Doe No. 1 to transition to Defendant Vruggink's office, and Defendant Myers and Defendant Vruggink forced John Doe No. 1 to sit in Defendant Vruggink's office for approximately one (1) hour without a bathroom break (the "**Vruggink Office Imprisonment**").

71.     Defendant Vruggink occupied a position of authority over John Doe No. 1 and threatened John Doe No. 1 that he would face severe punishment if he attempted to leave his office without his consent.

72.     John Doe No. 1 asked Defendant Vruggink if he could telephone his parents.

73.     Defendant Vruggink instructed John Doe No. 1 that he was unable to telephone his parents.

74.     John Doe No. 1 felt threatened and intimidated by Defendant Vruggink, and John Doe No. 1's freedom of movement was restricted by Defendant Vruggink during the Vruggink Office Imprisonment.

75.     When the Second Myers Office Imprisonment and Vruggink Office Imprisonment were discovered by Principal Thorn, she determined Defendant Myers and/or Defendant Vruggink treated John Doe No. 1 unfairly, including without limitation by isolating him in rooms without food, water, a bathroom break and/or by restricting John Doe No. 1's ability to telephone his parents.

76.     Principal Thorn apologized to John Doe No. 1 and his parents for such unfair treatment and informed them that John Doe No. 1 would not be suspended from Legacy.

77.     Principal Thorn investigated the False Allegations, and Principal Thorn determined that such allegations were false.

78.     After investigating the False Allegations, Principal Thorn determined that John Doe No. 1 and John Doe No. 2 didn't engage in sexual harassment of any female student and didn't maintain a "screw list."

79.     After investigating the False Allegations, Principal Thorn determined that Jane Doe violated Legacy's dress code policy by wearing a short dress.

80.     After investigating the False Allegations, Principal Thorn determined that Jane Doe bent over in front of John Doe No. 2 and exposed her buttocks to John Doe No. 2.

81.     After investigating the False Allegations, Principal Thorn determined that Jane Doe didn't hear John Doe No. 2 say "don't look, look at Max's head" to John Doe No. 1.

82.     Principal Thorn determined that John Doe No. 1 and John Doe No. 2 did not engage in sexual harassment.

83.     Upon investigation, Principal Thorn determined that a female student teased John Doe No. 1 about his hair and he responded by saying "pop the pimple on your nose before you make fun of my hair" (the "**Hair Incident**").

84.     Principal Thorn determined that John Doe No. 1's statement in connection with the Hair Incident didn't warrant any punishment under the Legacy Discipline Procedure.

85.     Principal Thorn informed Defendant Myers, Fonte, and Zander of her investigation of the False Allegations and the Hair Incident and her conclusions.

86.     Principal Thorn cautioned Defendant Myers and Fonte to refrain from making any false allegations against Plaintiffs because such false allegations could expose Legacy to liability.

87.     Upon information and belief, despite being cautioned by Principal Thorn, Defendant Myers and Fonte continued to falsely allege that Plaintiffs maintained a "screw list."

88.     Upon information and belief, despite being cautioned by Principal Thorn, Defendant Myers stated to Fonte, Zander and/or Holm that their daughters, respectively, were on a "screw list."

89.     Upon information and belief, Defendant Myers, Fonte, Zander, Ledesma, Wendel, Holm, and Defendant Vruggink were aware of the conclusions reached by Principal Thorn in connection with the False Allegations and the Hair Incident.

90.     Upon information and belief, Jane Doe and the female student involved in the Hair Incident are friends with the daughters of Defendant Fonte, Defendant Zander and/or Defendant Holm.

91.     Upon information and belief, despite being aware of the conclusions reached by Principal Thorn in connection with the False Allegations and the Hair Incident, Defendant Myers, and Defendant Vruggink published the False Allegations to Legacy's staff members, students and/or such students' parents, including, without limitation, John Doe No. 1's and John Doe No. 2's teachers, Zander's daughter(s), Fonte's daughter, Holm's daughter, Zander's spouse, Fonte's spouse, and Holm's spouse.

92.     Upon information and belief, despite being aware of the conclusions reached by  Principal Thorn in connection with the False Allegations and the Hair Incident, the False Allegations have spread throughout Legacy's community, and the False Allegations have triggered community outrage, ridicule, harassment and/or threats towards John Doe No. 1, John Doe No. 2 and their families.

93.    Upon information and belief, Defendant Myers, and Defendant Vruggink's publication of the False Allegations expressly violates Legacy's policy to keep "all matters involving sexual harassment . . . confidential to the extent possible." <u>Exhibit A</u> at 35.

94.    John Doe No. 1, John Doe No. 2 and their family members have received numerous text messages from Legacy's students and parents regarding the False Allegations. Such messages include threats of retaliation against John Doe No. 1 and John Doe No. 2 for the False Allegations.

95.    Upon information and belief, despite being aware of the conclusions reached by  Principal Thorn in connection with the False Allegations and the Hair Incident Defendants conspired to publish the False Allegations to Legacy's staff members, students and/or such students' parents, including, without limitation, John Doe No. 1's and John Doe No. 2's teachers, Zander's daughter(s), Fonte's daughter, Holm's daughter, Zander's spouse, Fonte's spouse, and Holm's spouse.

96.    Upon information and belief, prior to the Indecent Exposure, Principal Thorn reported numerous concerns to Legacy's board of directors in connection with Zander's actions and/or misconduct, including, without limitation, an incident of sexual harassment that occurred in Zander's office, efforts by Zander to conceal the sexual harassment by Greg Schondel of female teachers at Legacy, Zander's unauthorized usage of Principal Thorn's signature to endorse a check to Micah Chadrick, and Zander's inappropriate relationship with Micah Chadrick (collectively, the "**Zander Grievance**").

97.    Upon information and belief, in connection with the Zander Grievance, Principal Thorn recommended to Legacy's board of directors that Legacy terminate Zander's employment with Legacy.

98.    Upon information and belief, Principal Thorn worked with Legacy's legal counsel to terminate Zander's employment with Legacy in connection with the Zander Grievance.

99.    Upon information and belief, Zander and her husband are friends with Fonte, and Fonte buried the Zander Grievance and silenced any further discussions regarding the Zander Grievance.

100.   Upon information and belief, prior to the Indecent Exposure, Greg Schondel, a Legacy teacher, was terminated by Legacy for sexual harassment.

101.   Upon information and belief, Zander and her husband were personal friends with Greg Schondel.

102.   Upon information and belief, following the termination of Greg Schondel's employment with Legacy, Zander attempted to fuel community outrage regarding the termination of Greg Schondel, and Principal Thorn reported the same to Legacy's board of directors.

103.   Upon information and belief, following the termination of Greg Schondel's employment with Legacy, Zander's husband harassed and intimidated a victim of Greg Schondel, and Principal Thorn reported the same to Legacy's board of directors.

104.   Legacy's Handbook and District policies grant only Legacy's principal the authority to issue a suspension to students under certain circumstances.

105.   Upon information and belief, Principal Thorn was terminated as principal of Legacy in February of 2023 because she declined to suspend Plaintiffs from Legacy in connection with the False Allegations.

106.   Following the termination of Principal Thorn by Legacy, Defendant Vruggink was promoted to Interim Principal of Legacy, Legacy suspended John Doe No. 1 from school for two (2) days for sexual harassment and Legacy punished John Doe No. 2 with restorative lunch lessons and a daily behavior plan for sexual harassment.

107.   The Defendants did not report the allegations of sexual harassment levied against John Doe No. 1 and John Doe No. 2 to the District as required by the District Title IX Policy or the Nondiscrimination Complaint Process.

108.   The Defendants did not report the allegations of John Doe No. 1 and/or John Doe No. 2's sexual harassment to the District under the District Title IX Policy or the Nondiscrimination Complaint Process because such report would lead to an investigation that would completely refute any allegations of wrongdoing on the part of John Doe No. 1 or John Doe No. 2.

109.   Prior to sentencing John Doe No. 1 and John Doe No. 2 to out of school suspension for two (2) days, neither John Doe No. 1, John Doe No. 2, nor their parents were given an opportunity to address the allegations against them. Rather, the parents were simply notified that their boys were being suspended for sexual harassment, in complete contravention of Principal Thorn's investigative findings, and in contravention of their Due Process rights.

110.    Upon information and belief, Defendants (at the direction of the school board members) disciplined John Doe No. 1 and John Doe No. 2 in retaliation for John Doe No. 1 and John Doe No. 2 reporting Jane Doe's violation of Legacy's dress code policy, the Indecent Exposure and the  Hair Incident.

111.    Legacy is a part of the District. The District is governed by its board of education (the "**Board of Education**"). The Board of Education delegates authority to the principals of the District schools to suspend a student.

112.    John Doe No. 1 was not given an opportunity to deny the False Accusations at an informal hearing, to give his version of events, or to call witnesses, as required by the Board of Education's policies, Colorado statute, and the United States Supreme Court's longstanding ruling in *Goss v. Lopez*, 419 U.S. 565 (1975).

113.    John Doe No. 2 was not given an opportunity to deny the False Accusations at an informal hearing, to give his version of events, or to call witnesses, as required by the Board of Education's policies, Colorado statute, and the  United States Supreme Court's longstanding ruling in *Goss v. Lopez*, 419 U.S. 565 (1975).

114.    Upon information and belief, Defendants did not consider the following factors in determining whether to suspend John Doe No. 1, as required by the Board of Education: John Doe No. 1's age; John Doe No. 1's disciplinary history; the seriousness of the violation allegedly committed by John Doe No. 1, the threat John Doe No. 1 posed to students and staff; and the likelihood that a lesser intervention would properly address the alleged violation.

115.    Upon information and belief, Defendants did not consider the following factors in determining whether to suspend John Doe No. 2, as required by the Board of Education: John Doe No. 2's age; John Doe No. 1's disciplinary history; the seriousness of the violation allegedly committed by John Doe No. 2, the threat John Doe No. w posed to students and staff; and the likelihood that a lesser intervention would properly address the alleged violation.

116.    Upon information and belief, the Board of Education's policies prohibit Defendants from retaliating against John Doe No. 1 and John Doe No. 2 for reporting the Indecent Exposure.

117.    Defendants retaliated against John Doe No. 1 and John Doe No. 2 for reporting Jane Doe's violation of Legacy's dress code policies and the Indecent Exposure and the Hair Incident because Jane Doe and the female student involved in the Hair Incident are friends with the daughters of Fonte, Zander and/or Holm.

14

118.    Upon information and belief, Jane Doe didn't file a complaint and/or allege that she was sexually harassed by John Doe No. 1 and/or John Doe No. 2 in accordance with the Board of Education's policies.

119.    An Affidavit of Principal Thorn in connection with Defendants' misconduct towards Plaintiffs is attached hereto as Exhibit D.

120.    A copy of John Doe No. 1 & John Doe No. 2's permanent records evidencing the suspensions and/or punishments for "sexual harassment" and "comments of a sexual nature" are attached hereto as Exhibit E.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)
### (John Doe No. 1 against all Defendants)

121.    Plaintiffs incorporate and reallege all previously alleged Paragraphs set forth above as if fully set forth herein.

122.    An agreement existed between John Doe No. 1 and Legacy for John Doe No. 1's education.

123.    John Doe No. 1 agreed to be bound by the policies set forth in the Handbook as a condition to receiving education from Legacy, and Legacy agreed to provide John Doe No. 1 education as set forth in the Handbook and according to policies of the District.

124.    As a part of the enrollment process, John Doe No. 1 and his parents received a copy of the Handbook. His parents were required to sign the Handbook.

125.    Legacy agreed to abide by District policy, specifically, to implement the District Title IX Policy and the Nondiscrimination Complaint Process in the event of allegations of a student's sexual harassment and/or misconduct.

126.    John Doe No. 1 was accused of committing sexual harassment.

127.    Neither Legacy nor any of the other Defendants ever reported the allegations of John Doe No. 1's sexual harassment to the District's Title IX Coordinator or to the District's Compliance Officer designated to receive complaints of sexual harassment.

128.    Principal Thorn conducted an initial investigation of the False Allegations made against John Doe No. 1 in accordance with the Handbook, and determined that no sexual harassment had occurred.

129.   Nevertheless, John Doe No. 1 was suspended for sexual harassment.

130.   John Doe No. 1 has an unwarranted disciplinary history event of "Sexual Harassment" on his permanent school record as a result of the Defendants actions. Exhibit E.

131.   John Doe No. 1 was never given the benefit of a formal complaint under the District Title IX Policy or the Nondiscrimination Complaint Process to defend the allegations against him.

132.   John Doe No. 1 was never given access to supportive measures under the District Title IX Policy as a respondent.

133.   Legacy and the other Defendants breached their agreement with John Doe No. 1 by (1) failing to promptly forward the allegations of John Doe No. 1's alleged sexual harassment to the District's Compliance Officer under the Nondiscrimination Complaint Process and/or the District Title IX Coordinator; (2) breaching the Handbook's requirement that allegations of sexual harassment be kept confidential to the extent possible by publishing such allegations to friends, family, and other Legacy community members; (3) denying John Doe No. 1 access to the District's procedures to avail him of a prompt and fair investigation concerning the false allegations of sexual harassment; and (4) suspending John Doe No. 1 after Principal Thorn's initial investigation concluded that no punishment of any sort was warranted in response to the False Allegations.

134.   John Doe No. 1 substantially performed under his agreement with Legacy by, *inter alia*, conforming his conduct to the Code of Conduct for students as set forth in the Handbook.

135.   Legacy and the other Defendants intentionally acted in bad faith contrary to their duty of good faith to carry out the intent and purpose of the agreement with John Doe No. 1. Specifically, Legacy and the other Defendants intentionally failed to report the False Allegations to the District in order to prevent John Doe No. 1 from being vindicated as not committing sexual harassment.

136.   Legacy and the other Defendants' breach of the agreement with John Doe No. 1 has caused John Doe No. 1 to suffer damages, including without limitation, loss of his benefit of the bargain, an unwarranted suspension which could adversely affect his future educational opportunities, and loss of educational opportunities for being forced to withdraw from further enrollment at Legacy, in amounts to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)
### (John Doe No. 2 against Defendants)

137.   Plaintiffs incorporate and reallege all previously alleged Paragraphs set forth above as if fully set forth herein.

138.   An agreement existed between John Doe No. 2 and Legacy for John Doe No. 1's education.

139.   John Doe No. 2 agreed to be bound by the policies set forth in the Handbook as a condition to receiving education from Legacy, and Legacy agreed to provide John Doe No. 2 education as set forth in the Handbook and according to policies of the District.

140.   As a part of the enrollment process, John Doe No. 2 and his parents received a copy of the Handbook. His parents were required to sign the Handbook.

141.   Legacy agreed to abide by District Policy, specifically, to implement the District Title IX Policy and the Nondiscrimination Complaint Process in the event of allegations of a student's sexual harassment and/or misconduct.

142.   John Doe No. 2 was accused of committing sexual harassment, immediately triggering the requirement for Legacy and the other Defendants to make a report to the District.

143.   Neither Legacy nor any of the other Defendants ever reported the allegations of John Doe No. 2's sexual harassment to the District's Title IX Coordinator or to the District's Compliance Officer designated to receive complaints of sexual harassment.

144.   Principal Thorn conducted an initial investigation of the False Allegations made against John Doe No. 2 in accordance with the Handbook, and determined that no sexual harassment had occurred.

145.   Nevertheless, John Doe No. 2 was sentenced to in school lunch detention, and "would've had two days of OSS (out of school suspension)." Exhibit E.

146.   John Doe No. 2 has an unwarranted disciplinary history event of "Sexual Harassment" on his permanent school record as a result of the Defendants actions. Exhibit E.

147.   John Doe No. 2 was never given the benefit of a formal complaint under the District Title IX Policy or the Nondiscrimination Complaint Process to defend the allegations against him.

148.   John Doe No. 2 was never given access to supportive measures under the District Title IX Policy as a respondent.

149.   Legacy and the other Defendants breached their agreement with John Doe No. 2 by (1) failing to promptly forward the allegations of John Doe No. 2's alleged sexual harassment to the District's Compliance Officer under the Nondiscrimination Complaint Process and/or the District Title IX Coordinator; (2) breaching the Handbook's requirement that allegations of sexual harassment be kept confidential to the extent possible by publishing such allegations to friends, family, and other Legacy community members; (3) denying John Doe No. 2 access to the District's procedures to avail him of a prompt and fair investigation concerning the false allegations of sexual harassment; and (4) suspending John Doe No. 2 after Principal Thorn's initial investigation concluded that no punishment of any sort was warranted in response to the False Allegations.

150.   John Doe No. 2 substantially performed under his agreement with Legacy by, *inter alia*, conforming his conduct to the Code of Conduct for students as set forth in the Handbook.

151.   Legacy and the other Defendants intentionally acted in bad faith contrary to their duty of good faith to carry out the intent and purpose of the agreement with John Doe No. 2. Specifically, Legacy and the other Defendants intentionally failed to report the False Allegations to the District in order to prevent John Doe No. 2 from being vindicated as not committing sexual harassment.

152.   Legacy and the other Defendants' breach of the agreement with John Doe No. 2 has caused John Doe No. 2 to suffer damages, including without limitation, loss of his benefit of the bargain, an unwarranted suspension which could adversely affect his future educational opportunities, and loss of educational opportunities for being forced to withdraw as a student from Legacy.

## THIRD CLAIM FOR RELIEF
**(Violation of the Fourteenth Amendment of the United States Constitution
Procedural Due Process Pursuant to 42 U.S.C. § 1983)
(Plaintiffs Against Defendants)**

153.    Plaintiffs incorporate and reallege all previously alleged Paragraphs set forth above as if fully set forth herein.

154.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

155.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process. *Goss v. Lopez*, 419 U.S., 565 (1975).

156.    "The Due Process Clause also forbids arbitrary deprivations of liberty 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied." *Id* (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).

157.    Allegations of misconduct, especially of a sexual nature, "[i]f sustained and recorded . . . could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Id* at 575.

158.    Therefore, "students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Id* at 579.

   a.   Further, "[s]tudents facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Id* at 581.

159.    As a public institution, Legacy was required to honor the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution when it

wrongfully suspended John Doe No. 2 and John Doe No. 1 based upon the False Allegations.

160.   In the course of Legacy's investigation and adjudication, Legacy flagrantly violated Plaintiffs' clearly established rights under the Due Process clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness. Without limitation, such acts included the following:

   a.   Ignoring Principal Thorn's investigative findings that John Doe No. 2 and John Doe No. 1 did not commit sexual harassment;

   b.   Firing Principal Thorn when she would not suspend John Doe No. 2 and John Doe No. 1 for sexual harassment;

   c.   Failing to hold an informal hearing on the False Allegations and giving John Doe No. 2 and John Doe No. 1 an opportunity to address the False Allegations;

   d.   Failing to submit the False Allegations to the District Title IX Investigator for a fair and impartial investigation;

   e.   Failing to submit the False Allegations for a fair and impartial investigation under the District Nondiscrimination Complaint Process;

   f.   Wrongfully and arbitrarily placing a record of sexual harassment on the Plaintiffs' permanent school records; and

   g.   Wrongfully and arbitrarily suspending and/or punishing the Plaintiffs for sexual harassment based upon the False Allegations without any formal or informal hearing.

161.   Legacy willfully and wantonly violated Plaintiffs' Due Process rights.

162.   Legacy disregarded the clearly established Due Process rights of students in disciplinary proceedings when it deprived Plaintiffs of the requisite process.

163.   Based on the foregoing, Legacy deprived Plaintiffs of the requisite due process when they were not provided "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Here, Plaintiffs' had no opportunity to be heard regarding the False Accusations. At no time were they permitted to confront their accuser, cross-examine the witnesses against him or to present witnesses critical to their defense—this is because here there was

*no accuser to confront*, no reasonable and objective mind could conclude that any sexual harassment occurred.

    a.    Sexual harassment requires, at a minimum, a victim of unwanted conduct. Here, this critical element of sexual harassment is completely absent, rendering the suspension under the False Allegations all the more egregious.

164.   Based on the foregoing, Defendants failed to provide Plaintiffs with the basic due process protections that they are required to provide students accused of sexual misconduct, in violation of the Fourteenth Amendment.

165.   Based on the foregoing, Legacy violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the False Allegations against Plaintiffs.

166.   As a result of the foregoing, Plaintiffs are entitled to prospective injunctive relief, expunging Plaintiff's disciplinary records, removing any reference to the suspension from their educational file and destroying any and all records pertaining to the investigation.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor, granting the following relief against Defendants:

(a)    Specific performance ordering the Defendants to perform their duties under the Handbook to fairly adjudicate the False Accusations pursuant to the District's policies and procedures;

(b)    Judgment in favor of Plaintiffs and an award to Plaintiffs of full compensatory and consequential damages against Defendants, in an amount to be determined at trial, factoring in all interest, costs and expenses; and

(c)    (i) that the outcome and findings related to the sexual harassment charges against Plaintiffs be reversed; (ii) Plaintiffs' disciplinary record be expunged; (iv) the record of Plaintiffs' suspension be removed from their education files; (v) any and all records pertaining to the investigation be destroyed; and (vi) Legacy be enjoined from disclosing to any third parties any information related to the disciplinary charge, investigation, findings and/or sanction; and, (vii) for

such other and further relief as the court deems under the facts, circumstances, and evidence herein.

Respectfully submitted this 16th day of January 2024,

**WYSOCKI LAW GROUP, P.C.**

*/s/ Zachary Alan Crow*
Zachary Alan Crow
4582 S. Ulster St., Ste. 950
(303) 629-2801
zcrow@wysocki.law
***Attorney for Plaintiff***